UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BRUCE SIMONS, *et al*, § | |
| § | |
| Plaintiffs, § | |
| v. § | CIVIL ACTION NO. H-03-05825 |
| § | |
| DYNACQ HEALTHCARE, INC., *et al*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants Dynacq Healthcare, Inc. ("Dynacq"), Philip S. Chan, and Chiu M. Chan's Renewed Motion for Reconsideration of the Denial of Their Motions to Dismiss (Doc. # 150) (the "motion"). For the reasons set forth below, the motion is **DENIED**.

**I. Background**

This case involves claims of securities fraud under section 10(b) (and Rule 10(b)-5), and section 20(a) of the Securities Exchange Act. In its Order of July 28, 2005, the Court dismissed Plaintiffs' claims as to two Co-Defendants, Ernst & Young, LLP and James N. Baxter, but denied Defendants Dynacq, Philip Chan, and Chiu Chan's ("Defendants") motions to dismiss. Defendants contend that the July 28, 2005 Order denying their motions to dismiss was internally inconsistent, because the Court should have applied its reasoning with respect to the allegations against Ernst & Young to the allegations against Defendants.

Specifically, Defendants assert that the Court held that allegations concerning revenue recognition and internal controls did not constitute cognizable misstatements as to Ernst & Young, and thus, that Plaintiffs had failed to satisfy the first two elements of a securities fraud claim, falsity and materiality, in their allegations against Ernst & Young. Defendants urge that this reasoning is equally applicable to the allegations against them, and that the Court should have dismissed Plaintiffs' claims against Defendants concerning revenue recognition and internal

1

controls.  For purposes of this motion, Defendants have assumed that, through their allegations regarding Dr. Scheffey and Defendants' knowledge of Dr. Scheffey's history of drug abuse, medical malpractice, unnecessary surgical procedures, and overbilling, Plaintiffs adequately plead the element of scienter with respect to Defendants.[1]

Defendants' principal argument proceeds on a misapprehension.  In particular, Defendants contend that, "The determination whether a particular statement constitutes an actionable misstatement or omission of material fact (*i.e.*, whether it satisfies the first and second elements of a Rule 10b-5 claim:  falsity and materiality) does not change depending on the identity of the defendant."  Mot. at 2.  Defendants cite absolutely no authority for this bold statement and, on the facts of this case, it is almost certainly wrong.  As the Fifth Circuit has held, "it is wrong to treat each individual piece of information separately, as if it has no relation to the other pieces which surround it."  *Isquith v. Middle S. Utils. Inc.*, 847 F.2d 186, 200 n.9 (1988).  The Supreme Court, in another context, defined the standard of materiality as whether disclosure of an omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The "total mix" of information for which Defendants were responsible was quite different from the total mix for which Ernst & Young was responsible, at least according to Plaintiffs' well-pleaded allegations.

The leading authority on federal securities regulation refers approvingly to the "mosaic misrepresentation" theory.  "Each individual piece of information at issue needs to be evaluated in the context of the overall impression made by the defendant's statements."  Louis Loss & Joel

---

[1] Indeed, the Court found that Plaintiffs had more than sufficiently plead scienter on the part of Defendants:
> At this early phase of the case, it would appear from the submissions that Dynacq and the Chans were willing to profit from a physician who was a known danger to the public.  Having done so, there is not only a strong inference, but a high probability that they knew there would be related problems with Dynacq's quality of care, with workers' compensation claims, with accounts receivable, and indeed, with the overall integrity of Dyncacq's financial statements.

July 28, 2005 Order at 8.

2

Seligman, *Fundamentals of Securities Regulation* 917 (5th ed. 2003), citing *Genentech, Inc. Sec. Litig.* 1989 Fed. Sec. L. Rep. (CCH) ¶ 94,544 at 93,479 (N.D. Cal. 1989). Thus, "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). At trial, the Court may find all, or none, of the challenged statements and omissions to be material. But, at this stage, in view of the allegations as to Defendants' scienter, the Court is unable to conclude that any of the challenged statements is not part of a larger pattern.

## II. Analysis

### A. *Legal Standard for Reconsideration*

A motion for reconsideration may be made under either Federal Rule of Civil Procedure 59(e) or 60(b). *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Such a motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence. These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993).

### B. *Alleged Overstatement of Net Patient Service Revenue by Use of "Stop Loss" Provision*

Plaintiffs allege that Defendants materially overstated net patient service revenue in Dynacq's financial statements by applying a "stop loss" provision to its workers' compensation cases as the rule, rather than the exception. Plaintiffs' allegations against Defendants cover the entire class period, which runs from November 27, 2002 through December 19, 2003, while

3

Plaintiffs' allegations against Ernst & Young were limited to Dynacq's financial statements for fiscal year 2002. Ernst & Young resigned as Dynacq's auditor in 2003, citing an absence of internal controls necessary to develop reliable financial statements.

Defendants point out that, in dismissing Plaintiffs' claims against Ernst & Young, the Court found that Plaintiffs' Second Amended Complaint "fails to make clear how the allegations as to the inappropriate treatment of revenue materially affected the 2002 financial statements." July 28, 2005 Order at 7. Defendants contend that Plaintiffs made identical allegations against Defendants and Ernst & Young with respect to the application of the stop loss provision to workers' compensation cases, and that therefore, the Court must also conclude that Defendants' application of the stop loss provision did not materially affect the 2002 financial statements. Although Defendants recognize that Plaintiffs' allegations against them also cover financial statements from fiscal year 2003, Defendants urge that Plaintiffs similarly fail to plead how the allegedly improper use of the stop loss provision materially affected the 2003 financial statements. As Defendants correctly note, plaintiffs in securities fraud cases must plead materiality with particularity. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) ("Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.") (quotation omitted).

Here, however, Plaintiffs have sufficiently plead that Defendants' application of the stop loss provision to its workers' compensation cases materially affected Dynacq's financial statements in 2003 and over a broader period of years:

> The record of Dynacq's workers' compensation billings (via Vista) kept by the TWCC for the years 2000-2003 further underscores the unreasonable assumptions inherent in Dynacq's reported net patient revenue. During this period, Vista [H]ospital billed $17,136,099.66 for workers' compensation cases, but actually received only $5,843,262.09, a realization rate of only 34% . . . . Indeed, [the] TWCC report shows that $10,517,251.60 was billed in 2003 alone, of which Vista only realized $3,428,633.01.

4

Pls.' Second Am. Compl. ¶ 49.  Plaintiffs' allegations thus address the material effect of Dynacq's workers' compensation billing during the entire class period, and Plaintiffs' claims against Defendants should not be dismissed for failure to plead materiality.

Additionally, the Court's July 28, 2005 Order focused on the element of scienter with respect to Ernst & Young and concluded that Plaintiffs had failed to show that Ernst & Young knew, or was reckless in not knowing, of the inappropriate treatment of workers' compensation cases.  While Plaintiffs' Complaint indeed failed to clarify how Ernst & Young could have known that the inappropriate treatment of revenue materially affected the 2002 financial statements, it was perhaps incorrect to find that the Complaint failed to demonstrate a material effect on the 2002 statements.  A closer review of Plaintiffs' Second Amended Complaint reveals the allegation that, "[a]ccording to the TWCC, Vista was paid . . . only $1,062.890.19 on $3,130,525.12 on billings in 2002." Pls.' Second Am. Compl. n.5.  This allegation tends to show that Dynacq's reported revenue from workers' compensation cases materially exceeded revenue actually recognized.  Similarly, Plaintiffs alleged that, according to an article in Barron's magazine, "in fiscal year 2002, 70% of Dynacq's receivables were comprised of claims submitted to workers' compensation carriers." Pls.' Second Am. Compl. ¶ 41.  If Dynacq received only a portion of its workers' compensation billings, and these cases made up a significant portion of its reported revenue, then its use of the stop loss provision could indeed be material.

While Plaintiffs' allegations of materiality may not be abundant, they are present in the Complaint and sufficiently specific to meet the applicable pleading requirements.  Plaintiffs' claims against Defendants relating to alleged overstatement of revenue based on the use of the stop loss provision for workers' compensation cases should not have been dismissed.

*C. Alleged Overstatement of Revenue by Mischaracterizing Accounts Receivable*

Plaintiffs additionally allege that Defendants overstated Dynacq's revenue by mischaracterizing its accounts receivable as short term during the class period. Plaintiffs made similar allegations against Ernst & Young, which the Court dismissed for failure to demonstrate scienter. Specifically, Plaintiffs allege that $36,624,610.00 of Dynacq's $46,544,023.00 in accounts receivable for the fiscal year 2002 were subsequently reclassified as "long term," meaning that these accounts were not expected to be collected within one year. Pls.' Second Am. Compl. ¶ 55. Plaintiffs allege that, "[b]y not disclosing that the overwhelming majority of its receivables were of this [long term] category in its [c]lass [p]eriod financial statements, Dynacq misrepresented the risks associated with receiving payment for services it (allegedly) provided in workers['] compensation cases." Pls.' Second Am. Compl. ¶ 55.

Defendants point to certain language in the Court's July 28, 2005 Order with respect to this claim against Ernst & Young:

> [T]he collectibility of accounts receivable, especially in a new and apparently fast-growing business, are notoriously difficult to estimate with precision. In any event, the SEC has not required a writedown of Dynacq fiscal 2002 revenues or accounts receivable. The reclassification by the successor auditor of certain accounts receivable from short-term to long-term status had no effect on net revenues, net income, retained earnings, or earnings per share.

July 28, 2005 Order at 7. Defendants argue that the Court thereby ruled that the accounts receivable were not misstated in Dynacq's 2002 financial statements, and that therefore, like Ernst & Young, Defendants cannot be held responsible for any such statements.

Contrary to Defendants' assertions, the fact that Plaintiffs' Complaint does not show that the reclassification had any effect on net revenues, net income, retained earnings, or earning per share does not defeat Plaintiffs' allegations as to Defendants. Plaintiffs allege that, by not disclosing that the majority of its accounts receivables were long term, Defendants misrepresented the risks associated with its receipt of payments. This particular allegation of deliberate

6

misrepresentation did not similarly apply to Ernst & Young, and the Court's dismissal of the accounts receivable claims against Ernst & Young was based upon the absence of allegations suggesting scienter on its part. That the subsequent *reclassification* of accounts receivable may not have had a direct effect on the financial information does not mean that Defendants' alleged *misrepresentations* of accounts receivable as short term were not material misstatements, of which a reasonable investor would wish to be informed. Thus, the dismissal of Plaintiffs' related claims against Ernst & Young does not require dismissal of their claims against Defendants for allegedly overstating revenue by mischaracterizing accounts receivable.

### *D. Alleged Deficiencies in Internal Controls*

Finally, Plaintiffs allege that Dynacq lacked internal controls during the class period, which rendered its financial reporting unreliable, and that Defendants knowingly or recklessly failed to implement adequate internal controls, resulting in materially false and misleading financial statements. Plaintiffs also allege that statements made by the Chans in 2003 regarding Dynacq's internal controls were materially false and misleading. In support of these contentions, Plaintiffs allege that Ernst & Young's stated reason for its resignation as Dynacq's auditor was Dynacq's lack of internal controls, including a negotiated but not closed transaction in November 2003, which was not disclosed to Dynacq's Chief Financial Officer, independent auditors, or Board of Directors. Pls.' Second Am. Compl. ¶¶ 14, 97. Plaintiffs also point to a March 2002 shareholder derivative suit alleging deficiencies in Dynacq's internal controls, Dynacq's settlement of the derivative suit by agreeing to reform its system of internal controls, and the opinions of Dynacq's successor auditor that Dynacq continues to suffer from material weaknesses in its internal controls. Pls.' Second Am. Compl. ¶¶ 59, 60, 63. Plaintiffs similarly assert that Dynacq's recognition of medical supplies costs in the first three quarters of fiscal year 2003 was

inconsistent and required later reclassification of material amounts of expenses. Pls.' Second Am. Compl. ¶ 64.

Defendants now argue that, in dismissing Plaintiffs' internal control claims against Ernst & Young, the Court found that Plaintiffs had failed to plead cognizable misstatements based on alleged internal control deficiencies. With respect to the alleged November 2003 transaction that was not reported to Dynacq management, the Court found that "because the transaction in question was never consummated, there would not seem to be any impact on Dynacq's financial statements, and Plaintiffs have alleged none." July 28, 2005 Order at 5. Additionally, Defendants urge that, as to the successor auditor's finding of continued deficiencies in internal controls in 2003, the Court held that "this does not demonstrate weaknesses in internal controls during fiscal 2002, nor is any impact on Dynacq's 2002 financial statements alleged." July 28, 2005 Order at 5-6. Defendants urge that, since Plaintiffs did not sufficiently plead that there were weaknesses in internal controls with respect to Dynacq's 2002 financial statements, Defendants cannot have made a misstatement concerning internal controls in those financial statements. Defendants additionally argue that Plaintiffs have failed to plead that the alleged internal control deficiencies had any impact on Dynacq's fiscal year 2003 financial statements.

These contentions do not, however, require dismissal of Plaintiffs' internal control allegations as to Defendants. The Court's conclusion that certain allegations – regarding the November 2003 transaction and the successor auditor's criticisms – did not demonstrate an impact on Dynacq's 2002 financial statements does not mean that Plaintiffs failed to plead cognizable misstatements, based on alleged internal control deficiencies, with respect to Defendants. Plaintiffs specifically plead that Defendants' lack of internal controls led to inconsistent recognition of medical supplies costs in 2003, and that the successor auditor found internal control weaknesses in its audit of Dynacq's fiscal year 2003 financial statements. Unlike Plaintiffs'

8

claims against Ernst & Young, which were limited to the fiscal year 2002 financial statements, Plaintiffs' internal control claims against Defendants span fiscals years 2002 and 2003.[2] Similarly, the Chans allegedly made their misrepresentations regarding Dynacq's internal controls in January, April, and July of 2003.  Plaintiffs' allegations as to the deficiencies in internal controls relating to fiscal year 2003, therefore, are sufficient to support Plaintiffs' claims against Defendants.  The Court correctly declined to grant Defendants' motion to dismiss with respect to internal control deficiencies.

### III. Conclusion

Defendants have failed to show that the Court's findings with respect to Ernst & Young require dismissal of any of Plaintiffs' claims against Defendants.  Accordingly, Defendants' Renewed Motion for Reconsideration of the Denial of Their Motions to Dismiss is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 10th day of July, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT

---

[2] The Court has already recognized that, "Plaintiffs also contend, apparently with justification, that operating expenses were misstated in the quarterly reports for FY 2003.  E&Y is not being sued, however, for the FY 2003 quarterly reports, upon which they did not opine."  July 28, 2005 Order at 6.